MARIE MANNING,          )
                               )
        Plaintiff,     )
                               )     No. 4:07CV01244 FRB
                               )
        v.             )
                               )
                               )
MICHAEL J. ASTRUE, Commissioner  )
of Social Security,        )
                               )
        Defendant.     )

## MEMORANDUM AND ORDER

      This matter is on appeal for review of an adverse ruling by the Social Security Administration. All matters are pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).

## I.   Procedural Background

      On October 29, 2004, Marie Manning ("plaintiff") filed applications for a period of disability and disability insurance benefits ("DIB") under Title II, and for supplemental security income ("SSI") under Title XVI of the Social Security Act. (Administrative Transcript ("Tr.") at 40-42; 243-44.) Plaintiff alleged disability as of April 4, 1990 due to degenerative arthritis, hypertension, gastroesophageal reflux disease (GERD), and depression. (Tr. 54.) Plaintiff's initial applications were denied, and she filed a timely request for a hearing. (Tr. 39.) On November 9, 2006, a hearing was

held in St. Louis, Missouri, before Administrative Law Judge ("ALJ") Thomas C. Muldoon, during which plaintiff was represented by attorney Traci L. Severs. (Tr. 260-80.) In a decision dated November 22, 2006, ALJ Muldoon denied plaintiff's claims for benefits. (Tr. 12-20.) Plaintiff filed a Request for Review of Hearing Decision with defendant agency's Appeals Council, attaching a letter in support. (Tr. 8; 256-59.) In a decision dated May 22, 2007, the Appeals Council denied plaintiff's request for review. (Tr. 4-6.) The ALJ's decision thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

### A. Plaintiff's Testimony

At the hearing, plaintiff testified that she was born on September 18, 1960. (Tr. 263.) She lived on the third floor of a home with a friend and his father, in a home owned by the friend's father. (Tr. 263, 276.) Plaintiff has never applied for Medicaid. (Tr. 263.) Plaintiff did not graduate from high school, and does not remember the last grade she completed. Id. Plaintiff is a certified nurse's assistant ("CNA") (Tr. 264.) Plaintiff no longer has a driver's licence, and testified that she let it lapse because severe knee pain precluded her from driving. Id.

Plaintiff testified that she stopped working in 1990 after giving birth, stating that she wanted to stay home with her child. (Tr. 264-65.) Plaintiff testified that she felt she could not work as a CNA because the job required heavy lifting and walking, which

-2-

she was unable to do because of bilateral knee pain. (Tr. 265.) Plaintiff testified that she is unable to bend down or squat, and that both of her knees were constantly swollen and painful. (Tr. 265-66.) Plaintiff testified that she took medication, which she obtained from the free clinic, for the swelling in her knees, and also for sinus trouble. (Tr. 266-67.) Plaintiff testified that her right knee hurt worse than the left. (Tr. 267.) She testified that Drs. Brownfield and Lieu told her that she had chronic arthritis. (Tr. 268.) Plaintiff testified that she had been told that she may require surgical intervention in the future. Id.

Plaintiff testified that she also suffered from low back pain, and pain in her right arm, and that she had been told that she has scoliosis. (Tr. 268-69.) Plaintiff also complained of bilateral pelvic pain with radiation involving her knees. (Tr. 269.) Using a one-to-ten scale, plaintiff rated the pain in her right knee and pelvis at eight, and her left knee pain at five. (Tr. 270-71.) Regarding the pain in her right arm, plaintiff could not describe a cause, but stated that she felt a loss of strength, and had trouble picking up certain objects. (Tr. 271.)

Plaintiff testified that the medication Nexium[1] caused diarrhea, constipation, and abdominal pain. (Tr. 272.) Flonase[2]

---

[1] Nexium, or Esomeprazole, is used to treat gastroesophageal reflux disease (GERD), a condition in which backward flow of acid from the stomach causes heartburn and injury of the esophagus. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a699054.html

[2] Flonase, or Fluticasone, is a nasal spray used to relieve the symptoms of seasonal and perennial allergies. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a695002.html

caused occasional nosebleeds and sore throat. Id. Her new arthritis medication caused fatigue. Id.

Plaintiff testified that she had been seeing a psychiatrist, Dr. Krojenker, but stopped because she was unable to afford the medication, which cost $5.00 per bottle. Id. Plaintiff testified that she suffered from depression because she had to send her sons to live elsewhere because she was physically unable to care for them. (Tr. 273.) Plaintiff testified that she considered suicide in 2004 and was hospitalized, that she cries every day, and that she always thinks about her pain. (Tr. 273-74.)

Plaintiff denied current drug use, but testified that she once did crack and cocaine "to help with the pain". (Tr. 274-75.) She testified that she stopped taking drugs when she realized the negative effects on herself and her children, and because of the expense. (Tr. 275.) She was unable to remember when she stopped. Id. Plaintiff testified that she suffers from insomnia, which she attributed to pain. Id.

Plaintiff spends her days watching television and reading. (Tr. 276.) She testified she is able to sit for 15 to 20 minutes at a time, and has trouble standing. (Tr. 276, 278.) She has trouble getting out of bed in the morning, and sometimes requires help from her friend. (Tr. 276.) She does not often leave the house. (Tr. 278.) Plaintiff testified that she once used a cane, which she felt helped her walk and travel stairs more easily. (Tr. 276-77.) Plaintiff no longer has this cane, however, because she recently left

-4-

it at her sister's house, and someone took it.  (Tr. 276-77.)  She testified that she obtained a prescription for another cane, but was unable to afford to buy one.  (Tr. 277.)

Plaintiff testified that, if she is "outside waiting for somebody", she has to ensure that there is a nearby area where she can sit down.  (Tr. 278.)  She testified that she took the bus and walked to the bus stop, but had to stop walking after 20 to 30 steps and lean on something to relieve the pressure.  (Tr. 278-79.)

B.  Medical Records

The record indicates that plaintiff presented to the Grace Hill Neighborhood Health Center on August 29, 2001, stating that she had run out of her blood pressure medication.[3]  (Tr. 111.)  She reported smoking one pack of cigarettes per day, and drinking beer three to four times per week, but denied drug use.  Id.  It was noted that her hypertension was poorly controlled, and she was instructed to resume taking Procardia.[4] (Tr. 112.)

Plaintiff presented to the emergency room of South Pointe Hospital on September 30, 2001 with complaints of past and present pain and stiffness in her right knee.  (Tr. 106.)  Upon exam, plaintiff was found to be alert and in no distress, with no bruising or abrasions.  Id.  An x-ray of the right knee revealed no evidence

---

[3]The Grace Hill records alternately list plaintiff's date of birth as 9-18-60 and 1-18-60.  (Tr. 110-115.)  However, this appears to be nothing more than an immaterial clerical error.

[4]Procardia, or Nifedipine, is used to treat high blood pressure. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a684028.html

of fracture, dislocation, or bony destruction. (Tr. 109.) She was diagnosed with degenerative joint changes in her right knee, and advised to elevate the knee, use an Ace bandage and ice, take Advil[5] and Darvocet N-100[6], and to follow up at Grace Hill in seven to ten days, sooner if needed. (Tr. 105.)

Plaintiff returned to Grace Hill on January 8, 2002 with complaints related to hypertension. (Tr. 113.) She was advised to stop using cigarettes and alcohol, drink more water, and get good nutrition. Id. The progress note indicates that plaintiff had presented to an emergency room the preceding night for vertigo, and that she had been out of her medications for a "few months." (Tr. 114.)

The record indicates that plaintiff presented to People's Health Center on April 15, 2002 requesting a pregnancy test, stating that she had been feeling fetal movement for three months. (Tr. 119, 134.) She also complained of hypertension, and stated she had last taken blood pressure medication five months earlier. (Tr. 134.) On April 16, 2002, a substance use risk assessment was completed. (Tr. 119.) Plaintiff admitted to a recent history of crack cocaine use, reporting that her last use was "when finding out she was pregnant." Id. Plaintiff delivered a baby girl on June 26, 2002, and placed the

---

[5]Advil, or nonprescription ibuprofen, is used to reduce fever and to relieve mild pain from headaches, muscle aches, arthritis, menstrual periods, the common cold, toothaches, and backaches. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682159.html

[6]Darvocet N-100, or Propoxyphene, is used to relieve mild to moderate pain. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682325.html

baby up for adoption. (Tr. 121, 137.) On August 21, 2002, plaintiff presented to the clinic for a gynecological consultation, and to discuss tubal ligation. (Tr. 122.) In January 2003, it was noted that plaintiff was not compliant with visits or medication, and unsuccessful attempts were made to contact her. (Tr. 123.)

On May 6, 2003, plaintiff saw Samuel Joseph, P.A.C., at People's Health, with complaints of swelling and pain in both knees, and right hip pain. (Tr. 124.) Mr. Joseph noted plaintiff was out of blood pressure medication, and that she was noncompliant with visits and medication. Id. Plaintiff's physical exam was negative with the exception of bilateral knee pain, and she was noted to be alert and pleasant. Id. Mr. Joseph noted that plaintiff's blood pressure was poorly controlled, and that she refused a transfer to the emergency room. (Tr. 125.) Mr. Joseph encouraged her to comply with her treatment, restarted plaintiff on Norvasc,[7] and prescribed Naprosyn[8] for plaintiff's knee pain. Id.

Plaintiff saw Mr. Joseph again on May 13, 2003. (Tr. 126.) Mr. Joseph noted that plaintiff had not filled her Naprosyn prescription, and continued to complain of right knee pain. Id. Her hypertension had improved, however, and she was advised to continue taking Norvasc. (Tr. 127.) She was advised to take Naprosyn, and to

_____

[7]Norvasc, or Amlodipine, is used alone or in combination with other medications to treat high blood pressure and chest pain. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a692044.html

[8]Naprosyn is used to relieve pain, tenderness, swelling and stiffness associated with different types of arthritis. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a681029.html

call the clinic if she failed to improve.  Id.  Plaintiff did not show for a June 5, 2003 appointment, but visited the clinic on July 10, 2003 for a gynecological consultation to discuss permanent sterilization.  (Tr. 128.)  It was noted she was taking Norvasc, and was also apparently taking Depo-Provera.[9]  On July 11, 2003, plaintiff presented for a Norvasc refill.  (Tr. 129.)

On August 13, 2003, plaintiff saw Helen Allen, R.N., at the People's Clinic with complaints of right knee pain, and for hypertension follow-up.  (Tr. 130.)  Plaintiff also stated that she had lost her blood pressure prescription, but her hypertension seemed adequately controlled.  Id.  Plaintiff's exam was unremarkable for physical or psychiatric findings.  Id.  Plaintiff was diagnosed with mild hyperlipidemia and prescribed a low-fat diet.  (Tr. 131.)  She was advised to use a knee brace, to continue taking her blood pressure medication, to stop smoking, and return for follow-up in three months.  Id.  Plaintiff returned on November 12, 2003 and saw Dr. Tony Lam.  (Tr. 132.)  Plaintiff requested and received medication refills, and was advised to stop smoking and follow a low-cholesterol diet.  (Tr. 133.)

On February 19, 2004, plaintiff presented to the St. Louis ConnectCare Urgent Care center for a blood pressure check, and with complaints of pain and swelling in her right knee.  (Tr. 139.) Plaintiff was taking Norvasc and Naprosyn, but had been out of her

---

[9]Depo-Provera is an injection used to prevent pregnancy. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a604039.html

blood pressure medication for three months. Id. However, plaintiff's blood pressure was only a mildly elevated 153/80. Id. Plaintiff described her knee pain as a "mild ache," and it was noted that she did not limp. (Tr. 140.) She reported being homeless. Id. Plaintiff was diagnosed with hypertension and arthralgia, given Norvasc and Naprosyn, and advised to follow up in three to four weeks. Id. Plaintiff returned on May 28, 2004 with complaints of pain and swelling on the right side of her neck. (Tr. 144.) Her blood pressure at this time was 131/82. Id. She was noted to have a small mass on the right side of her neck, and was given Amoxicillin[10] and Motrin. Id.

Records from the Missouri Department of Health indicate that plaintiff was involuntarily hospitalized from June 2, to June 7, 2004 after her pastor took her to the emergency room when she reported worsening depression and suicidal ideation.[11] (Tr. 163.) Plaintiff reported increasing depression since 2000, when her long-term boyfriend died, and an exacerbation in her depression in the past two weeks due to her living situation and "missing her kids." Id. Plaintiff reported that she had four children with whom she had no contact. (Tr. 171.) Plaintiff reported having been jailed for 23 days in 2000 for prostitution. (Tr. 168.) Plaintiff reported that

---

[10]Amoxicillin is used to treat certain infections caused by bacteria, such as pneumonia; bronchitis; gonorrhea; and infections of the ears, nose, throat, urinary tract, and skin.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a685001.html

[11]The record indicates that, although plaintiff was admitted as an involuntary patient, she wanted to be admitted. (Tr. 164.)

she was currently living in the attic of a house owned by her current boyfriend's father.  Id.  The father was unaware that plaintiff was living in the house, and would not approve if he did know.  Id. Therefore, plaintiff's activities were severely restricted.  Id. She had to remain in the attic and remain quiet, and was not even permitted to use the bathroom, which was not located in the attic, as needed. (Tr. 168.)  Frustrated with this situation, plaintiff left the house, used cocaine, and considered committing suicide by jumping out of the attic window, but went to her pastor's home and confided the foregoing to him, and he took her to the emergency room.  (Tr. 163, 168.)

Plaintiff reported spending about $20.00 per week on cocaine. (Tr. 171.)  Upon admission, plaintiff's symptoms included decreased energy, low mood, crying spells, anhedonia, low self-esteem, increased appetite, sleep disturbance, and suicidal ideation. (Tr. 163.)  Plaintiff reported occasional cocaine use, stating that she last used on the morning of admission, but then stated that, since living in the boyfriend's attic, she stopped using cocaine and working as a prostitute.  Id.  She reported drinking beer occasionally.  Id.  She reported having driven her car into a wall three years ago, but identified this as an impulsive episode rather than a suicide attempt.  (Tr. 164.)

Plaintiff reported suffering from GERD, arthritis, and hypertension.  Id.  Plaintiff's physical examination was unremarkable with the exception of tenderness due to an enlarged right

-10-

submandibular lymph node, which had resolved by the date of discharge. Id. Plaintiff was noted to be motivated for treatment. (Tr. 168.) She was given Wellbutrin XL,[12] which "she tolerated well and did not have any side effects." (Tr. 164.) Plaintiff was given Paxil,[13] and was also given Trazodone[14] to aid sleep, Pepcid[15] for her GERD symptoms, Vioxx[16] for arthritis and amoxicillin to treat an upper respiratory tract infection and the enlarged lymph node. Id. Plaintiff was also restarted on Norvasc. (Tr. 165.) It was noted that plaintiff remained pleasant, cooperative and compliant with her treatment throughout her stay, and that when she was discharged, she was stable and improved, and reported feeling much better. Id. There were no limitations placed upon her activities. Id.

Records from the Hopewell Center indicate that plaintiff presented on June 24, 2004 and saw Susan Kohler, L.C.S.W., with complaints of insomnia, frequent nighttime waking, feelings of sadness, suicidal ideation, and feeling like she was "starting to get

---

[12]Wellbutrin, or Buproprion, is used to treat depression. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a695033.html

[13]Paxil, or Paroxetine, is used to treat depression, panic disorder, and social anxiety disorder. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a698032.html

[14]Trazodone is used to treat depression. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a681038.html

[15]Pepcid, or Famotidine, is used to treat gastroesophageal reflux disease, or GERD. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a687011.htm

[16]Vioxx, or Rofecoxib, is a nonsteroidal anti-inflammatory drug NSAID) developed by Merck & Co. to treat osteoarthritis, acute pain conditions, and dysmenorrhea. http://en.wikipedia.org/wiki/Vioxx. On September 30, 2004, its manufacturer voluntarily withdrew it from the market due to concerns about increased cardiac risks associated with long term, high-dosage use. Id.

depressed again." (Tr. 149-50, 154.) Plaintiff reported having six sisters and three brothers, with whom she had some contact. (Tr. 151.) She reported living "with a friend in a house." Id. It was noted that plaintiff completed the eleventh grade, and quit school to sell drugs. Id. She was currently unemployed, and reported having last worked as a CNA fourteen years ago. Id. Plaintiff reported an unstable family history, including an abusive father who was stabbed to death by one of plaintiff's brothers, and a mother who died when plaintiff was eight. (Tr. 152.) Plaintiff reported that she enjoyed watching television, reading, and playing cards. Id. She reported having high blood pressure, arthritis in both knees, and acid reflux. Id. She reported having "attempted suicide" on two occasions: driving her car into a wall during her late twenties, and trying to jump out of a window immediately preceding her aforementioned hospitalization. Ms. Kohler diagnosed major depression, and referred plaintiff to Hopewell to see a psychiatrist. (Tr. 160.)

On July 20, 2004, plaintiff saw Charles Lieu, M.D., at ConnectCare, stating that she needed blood pressure medication, and complaining of right knee pain. (Tr. 183.) Radiological examinations of plaintiff's bilateral knees on this date revealed "minimal degenerative joint disease without evidence of fractures, dislocation or other significant bony pathology." (Tr. 191.) She was prescribed Naprosyn. (Tr. 183, 185.)

Plaintiff returned to the Department of Health on August 1, 2004 and saw a Dr. Nicor with the same complaints of depression over

-12-

her situation, and a desire to kill herself by jumping out of a window. (Tr. 177.) She stated that the Wellbutrin had helped, but she had run out. (Tr. 177.) Plaintiff was diagnosed with depression, but was noted to be "medically stable" and only "mildly ill". (Tr. 180.)

On August 9, 2004, Dr. Lieu ordered a radiological gastrointestinal series, which was interpreted as normal. (Tr. 193.)

Plaintiff saw Dr. Lieu on August 24, 2004 with complaints of knee pain. (Tr. 187.) It was noted that her blood pressure was controlled, and she was given Naprosyn. Id.

On September 20, 2004, plaintiff visited ConnectCare with complaints related to her left knee and her sinuses. (Tr. 189.) Plaintiff reported that she had filed for SSI, disability, and was awaiting a statement from Dr. Lieu that she was unable to maintain employment due to her knees being swollen and painful. Id. She reported that she had not taken her medications that day. Id. Upon exam, she was noted to have bilateral swelling in her knees, and sinus inflammation. Id. Her medications were refilled. (Tr. 189.)

On December 20, 2004, plaintiff's friend Timothy Standard completed a third-party function report. (Tr. 78-86.) Mr. Standard indicated that he had known plaintiff for 20 years, that she stayed at his house, and spent her days watching TV, playing cards, and talking. (Tr. 78, 82.) Mr. Standard indicated that plaintiff did not often come out of her room, and instead stayed upstairs because the steps were too hard for her to climb. Id. He indicated that

-13-

plaintiff sometimes called for him to help her when she was in pain. (Tr. 79.) He indicated that plaintiff was afraid of showers, and of descending stairs. (Tr. 79, 84.) According to Mr. Standard, plaintiff prepared food or meals on a weekly basis, but he did the household chores. (Tr. 80.) He has never seen plaintiff shop, and wrote that plaintiff had no income. (Tr. 81.) He indicated that plaintiff never went anywhere on a regular basis. (Tr. 82.) He indicated that plaintiff had numerous postural limitations, and could only walk about one block. (Tr. 83.) He indicated that plaintiff did not handle stress well, and that she used a cane. (Tr. 84.)

On March 7, 2005, plaintiff underwent a psychological evaluation with Tom Davant Johns, Ph.D., at Forest Park Medical Clinic, Inc. (Tr. 194-98.) Dr. Johns noted that plaintiff came alone to the appointment, having traveled by bus. (Tr. 194.) She complained of arthritis and depression. Id. Plaintiff reported treating with Dr. Krojanker at Hopewell Clinic for depression, stating that Wellbutrin was helpful. Id. Plaintiff noted loss of appetite with a three pound weight loss in the last six months; decreased sleep and energy; occasional irritability, and trivial difficulties with memory. (Tr. 195.) She had decreased concentration, but denied anhedonia. Id. She occasionally felt hopeless and helpless, and had poor self-esteem. Id. She noted two prior suicide attempts, the first when she drove her car into a wall, and the second when she thought about jumping out of a window. Id.

Plaintiff stated that she currently drank two 16-ounce beers per day. (Tr. 195.) She denied using all other substances, including cocaine. Id. Plaintiff described a turbulent high school experience, which included fighting with students and teachers, threatening others with violence and with weapons, and truancy. (Tr. 196.) Plaintiff reported having last worked as a CNA in 1990, and reported leaving that job by not returning after maternity leave. Id. Plaintiff denied arrests and incarcerations; however, Dr. Johns noted that available records indicated a 23-day imprisonment for prostitution in 2000. Id.

Upon exam, plaintiff was noted to be well-groomed, with appropriate makeup and jewelry. Id. She did not appear depressed, and in fact, Dr. Johns noted that she appeared "affectively bright" with an alert facial expression, normal motor activity, adequate eye contact, and normal gait and posture. (Tr. 196.) Plaintiff reported living with a friend in the friend's home, and was able to cook, clean, grocery shop, and do laundry for herself. (Tr. 197.) She got around by either walking or using public transportation independently. Id. Plaintiff spent her days reading or watching television, cleaned her own room, and socialized with the people she lived with. Id. The person she lived with was her only friend. Id. She had no regularly scheduled social activities, but left the house once per week to go to the library or the park. (Tr. 197-98.)

Dr. Johns opined that plaintiff was capable of getting along with family, friends, and people in general if she so elected.

(Tr. 198.)  Dr. Johns opined that plaintiff would be capable of completing simple tasks in a timely manner over a sustained period of time if she so elected.  <u>Id.</u>  Dr. Johns' assessed plaintiff with depressive disorder, currently mild with treatment; antisocial personality disorder; alcohol dependence; and cocaine abuse which may or may not be in remission.  <u>Id.</u>  He assigned plaintiff a GAF of 75. <u>Id.</u>

Also on March 7, 2005, plaintiff underwent a general medical evaluation with Elbert H. Cason, M.D., at Forest Park Medical.  (Tr. 199-202.)  Plaintiff complained of degenerative arthritis in both of her knees and right hip; hypertension, and GERD. (Tr. 199.)  Plaintiff stated that she takes Naproxen which helps somewhat, and walks with a cane, which is not doctor-prescribed.  <u>Id.</u> Plaintiff reported being able to walk one block, stand for 30 minutes, ascend one flight of stairs, and bend over, but could not squat down.  <u>Id.</u>  Plaintiff's blood pressure was "excellent" at 110/80, and she stated she was taking her medication.  <u>Id.</u>  Plaintiff reported that the medication she took for GERD helped a lot.  (Tr. 199.)

Plaintiff reported living with friends, and stated that she did no household chores.  <u>Id.</u>  She reads and watches television, and leaves the house once per week.  (Tr. 199-200.)  Plaintiff's physical exam was essentially normal, with the exception of knee pain upon straight leg raise testing.  (Tr. 200.)  Plaintiff walked with a slight limp on her right leg without the cane.  (Tr. 201.)  Dr. Cason

opined that plaintiff did not need the cane to walk.  Id.  Muscle strength testing of plaintiff's upper and lower extremities was normal, and plaintiff had normal dexterity.  Id.  Dr. Cason's impression was degenerative arthritis involving plaintiff's knees and hip which responded well to Naproxen; hypertension for which plaintiff took medication and was measured in the excellent range; and GERD which responded well to medication.  Id.

On March 24, 2005, a physical residual functional capacity assessment was performed by Abigail Cooke.  (Tr. 205-12.)  Ms. Cooke found that plaintiff could occasionally lift/carry 20 pounds and frequently lift/carry 10; could stand/walk at least two hours in an eight-hour workday; could sit for about six hours, and could push/pull without limitation.  (Tr. 206.)  Plaintiff could occasionally climb, but could never balance, crouch or crawl.  (Tr. 207.)  She had no other limitations.  (Tr. 208-09.)  Ms. Cooke noted that plaintiff alleged knee pain which caused functional limitations, but told the psychiatric doctor that she was able to do chores, shop, and perform other activities of daily living.  (Tr. 210.)  Ms. Cooke noted inconsistencies between plaintiff's reports and her allegations, and concluded that her allegations were partially credible.  Id.

Also on March 24, 2005, Judith A. McGee, Ph.D., completed a psychiatric review technique.  (Tr. 213-25.)  Dr. McGee found that plaintiff had non-severe affective disorders and personality disorders.  (Tr. 213.)  Dr. McGee found that plaintiff had no

restrictions on her activities of daily living or in maintaining concentration, persistence or pace, but had mild difficulties in maintaining social functioning. (Tr. 223.) Dr. McGee noted that plaintiff had reported being able to cook, clean, shop, do laundry, and use public transportation without difficulty, and that she had intact concentration/attention. (Tr. 225.) Dr. McGee concluded that plaintiff had mild depressive disorder, antisocial personality disorder, and alcohol/cocaine abuse, and assigned a GAF of 75. Id.

Finally, the record indicates that plaintiff presented to the ConnectCare Urgent Care Center on January 24, 2006 with complaints of pain under her left breast, and in her left upper back. (Tr. 236-42.) X-rays revealed a normal chest. (Tr. 235.) Plaintiff did not report complaints referable to any other part of her body, including her knees, nor did she complain of depression or other psychological disturbance. See (Tr. 234-42.) Plaintiff was advised to stop smoking crack. (Tr. 236, 238.)

III.     The ALJ's Decision

The ALJ in this case found that plaintiff had mild degenerative joint disease of the knees, hypertension, and GERD controlled by medication, mild hyperlipidemia, mild depression not otherwise specified, and a history of alcohol and cocaine use, but had no impairment or combination of impairments of listing-level severity. (Tr. 19.) The ALJ found that plaintiff had the residual functional capacity ("RFC") to perform the physical exertional and nonexertional requirements of work except for lifting or carrying

more than ten pounds frequently or more than 20 pounds occasionally. Id. The ALJ found no credible, medically-established mental or other nonexertional limitations. Id.

The ALJ found that plaintiff was last eligible for Title II DIB on December 31, 1995, but that she had presented no evidence of a medically determinable impairment precluding the performance of all work for a continuous period of at least twelve months beginning on or before the expiration of that date. (Tr. 13.) The ALJ noted that plaintiff said she stopped working in 1990 because of pregnancy and her desire to be a stay-at-home mother to her child, and he also noted that the earliest medical record was dated August 29, 2001, after the expiration of her insured status. Plaintiff does not contest this determination.[17]

The ALJ properly considered and discredited plaintiff's allegations of pain, depression and other symptoms precluding all work. Although the ALJ did not cite Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984), he listed the relevant factors therefrom, and cited 20 C.F.R. § 416.929 which corresponds with Polaski and credibility determination. The ALJ then reviewed the evidence, discussed all of the relevant factors, and concluded that the preponderance of the medical and other evidence in the record was

---

[17]This Court will therefore not review the ALJ's decision to deny plaintiff's DIB application. See Johnson v. Chater, 108 F.3d 942, 945-46 (8th Cir. 1997); see also Roth v. G.D. Searle & Co., 27 F.3d 1303, 1307 (8th Cir. 1994) (citing Stafford v. Ford Motor Co., 790 F.2d 702, 706 (8th Cir. 1986) ("The district courts cannot be expected to consider matters that the parties have not expressly called to their attention, even when such matters arguably are within the scope of the issues that the parties have raised."))

inconsistent with plaintiff's allegations of pain, depression, and other conditions precluding all work. (Tr. 14, 16-18.) The ALJ found that there was no credible, documented medical evidence indicating any chronic mental or other nonexertional impairment serious enough to prevent plaintiff from performing the full range of at least light work. (Tr. 17-18.) The ALJ also found that plaintiff had no substance use disorder that was uncontrollable and which prevented the performance of substantial gainful activity. (Tr. 20.)

The ALJ found that plaintiff was unable to perform her past relevant work, but retained the RFC for the full range of at least light work. Id. In so finding, the ALJ noted that his burden of showing that there were jobs in the national economy that plaintiff could perform could be satisfied by reference to the Medical-Vocational Guidelines because plaintiff's limitations were strictly exertional in nature, and there were no credible, medically-established nonexertional limitations. (Tr. 18.) The ALJ concluded that plaintiff was not under a disability as such is defined in the Act at any time through the date of the decision. Id.

## IV. Discussion

To be eligible for supplemental security income under the Social Security Act, a plaintiff must prove that she is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary of Health & Human Services, 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines "disability" in terms of the effect a physical or mental impairment has on a person's ability to function in the workplace. It provides disability benefits only to

those unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). It further specifies that a person must be both unable to do his previous work and unable, "considering his age, education, and work experience, [to] engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 1382c(a)(3)(B); Bowen v. Yuckert, 482 U.S. 137, 140 (1987); Heckler v. Campbell, 461 U.S. 458, 459-460 (1983).

To determine whether a claimant is disabled, the Commissioner utilizes a five-step evaluation process. See 20 C.F.R. § 416.920; Bowen, 482 U.S. at 140-42. The Commissioner begins by considering the claimant's work activity. If the claimant is engaged in substantial gainful activity, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe impairment," meaning one which significantly limits his ability to do basic work activities. If the claimant's impairment is not severe, then he is not disabled. The Commissioner then determines whether claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment is equivalent to one of the listed impairments, he is conclusively

-21-

disabled. At the fourth step, the Commissioner establishes whether the claimant has the residual functional capacity to perform his past relevant work. If so, the claimant is not disabled. If not, the burden then shifts to the Commissioner to prove that there are other jobs that exist in substantial numbers in the national economy that the claimant can perform. Pearsall, 274 F.3d at 1217, Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000). Absent such proof, the claimant is declared disabled and becomes entitled to disability benefits.

The Commissioner's findings are conclusive upon this Court if they are supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Young o/b/o Trice v. Shalala, 52 F.3d 200 (8th Cir. 1995), citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993). Substantial evidence is less than a preponderance but enough that a reasonable person would find adequate to support the conclusion. Briggs v. Callahan, 139 F.3d 606, 608 (8th Cir. 1998). To determine whether the Commissioner's decision is supported by substantial evidence, the Court must review the entire administrative record and consider:

1.   The credibility findings made by the ALJ;

2.   The plaintiff's vocational factors;

3.   The medical evidence from treating and consulting physicians;

4.   The plaintiff's subjective complaints relating to exertional and nonexertional activities and impairments;

5.  Any corroboration by third parties of the plaintiff's impairments;

6.  The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth the plaintiff's impairment.

Stewart v. Secretary of Health & Human Services, 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any "evidence which fairly detracts from the ALJ's findings." Groeper v. Sullivan, 932 F.2d 1234, 1237 (8th Cir. 1991); see also Briggs, 139 F.3d at 608. However, where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence may support a different outcome. Briggs, 139 F.3d at 608; Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992), citing Cruse, 867 F.2d at 1184.

In the case at bar, plaintiff argues that the record establishes that she suffers from both exertional impairments, and from the nonexertional impairments of pain and depression. Plaintiff argues that the ALJ's decision is therefore legally insufficient because he failed to elicit vocational expert ("VE") testimony, and instead relied upon the Guidelines to meet his burden of proving that plaintiff was able to engage in work that exists in the national economy. In response, the Commissioner argues that the ALJ's reliance upon the Guidelines was proper, inasmuch as he properly discredited plaintiff's allegations of pain and depression precluding all work. The Commissioner's arguments are well-taken.

As discussed above, the ALJ utilizes a five step analysis to determine whether a claimant is disabled. Through step four, the claimant carries the burden of establishing that he is unable to perform his past relevant work. <u>Pearsall</u>, 274 F.3d at 1219 (citing <u>Singh v. Apfel</u>, 222 F.3d 448, 451 (8th Cir. 2000)). At step five, however, the burden shifts to the Commissioner to establish that the claimant retains the residual functional capacity to perform a significant number of jobs that exist in the national economy. <u>Id.</u> There are two means by which the Commissioner can meet its burden at step five: reliance upon the Guidelines, or obtaining VE testimony. "If an applicant's impairments are exertional, (affecting the ability to perform physical labor), the Commissioner may carry this burden by referring to the medical-vocational guidelines or 'Grids,' which are fact-based generalizations about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment." <u>Gray v. Apfel</u>, 192 F.3d 799, 802 (8th Cir. 1999). If the claimant has nonexertional impairments, use of the Guidelines is inappropriate, and VE testimony is required. <u>Pearsall</u>, 274 F.3d at 1219 (citing <u>Banks v. Massanari</u>, 258 F.3d 820, 827 (8th Cir. 2001)). However, if the ALJ explicitly discredits the claimant's subjective allegations for legally sufficient reasons, the ALJ may use the Guidelines to meet his step five burden. <u>Bolton v. Bowen</u>, 814 F.2d 536, 538 (8th Cir. 1987); <u>see</u> <u>also</u> <u>Reynolds v. Chater</u>, 82 F.3d 254, 258-59 (8th Cir. 1996); <u>Carlock v. Sullivan</u>, 902 F.2d 1341, 1343 (8th Cir. 1990);

-24-

<u>Cruse</u>, 867 F.2d at 1187.

In this case, because the ALJ properly discredited plaintiff's allegations of disabling pain and depression for legally sufficient reasons, he was entitled to rely upon the Guidelines to meet his burden at step five. The undersigned will first discuss the ALJ's analysis of plaintiff's allegations of disabling pain.

Testimony regarding pain is necessarily subjective in nature, as it is the claimant's own perception of the effects of his alleged physical impairment. <u>Polaski</u>, 739 F.2d at 1321; <u>Halpin v. Shalala</u>, 999 F.2d 342, 346 (8th Cir. 1993). Because of the subjective nature of physical symptoms, and the absence of any reliable technique for their measurement, it is difficult to prove, disprove or quantify their existence and/or overall effect. <u>Polaski</u> at 1321-22. In <u>Polaski</u>, the Eighth Circuit addressed this difficulty and set forth the following standard:

> "The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; (5) functional restrictions."

<u>Id.</u> at 1322.

Although the ALJ may not accept or reject the claimant's subjective complaints based solely upon personal observations, he may discount such complaints if there are inconsistencies in the evidence as a whole. Id. The "crucial question" is not whether the claimant experiences symptoms, but whether his credible subjective complaints prevent him from working. Gregg v. Barnhart, 354 F.3d 710, 713-14 (8th Cir. 2003). The foregoing Polaski factors are to be considered in addition to the objective medical evidence of record. See Baldwin v. Barnhart, 349 F.3d 549, 558 (8th Cir. 2003). When an ALJ explicitly considers the Polaski factors and discredits a claimant's subjective complaints for a good reason, that decision should be upheld, even if the ALJ does not specifically cite to the Polaski decision. Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001). The credibility of a claimant's subjective testimony is primarily for the ALJ, not this Court, to decide, and this Court considers with deference the ALJ's decision on the subject. Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005).

In the case at bar, although the ALJ did not specifically cite the Polaski decision, this does not defeat the ALJ's determination. See Hogan, 239 F.3d at 962. The ALJ cited the proper regulation corresponding with Polaski and credibility determination, and he correctly listed all of the factors relevant to the analysis. See Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001) (No error arose from the ALJ's credibility determination even when he

failed to cite <u>Polaski</u>; ALJ cited the proper regulation and correctly listed the relevant factors.)

The ALJ began his analysis by noting that, although plaintiff had a reasonably steady work record up to and including her date of disability, the preponderance of the evidence of record suggested that plaintiff's allegations of pain precluding all work were not credible. For plaintiff's claim of disability due to knee pain, the ALJ noted the lack of medical evidence that plaintiff actually had a severe knee impairment. The Eighth Circuit has recognized that an ALJ is bound to accept "alleged functional limitations and restrictions due to pain and other symptoms" only to the extent that they can "reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence." <u>Randolph v. Barnhart</u>, 386 F.3d 835, 842 (8th Cir. 2004). The ALJ noted that, on February 19, 2004, plaintiff's right knee pain was diagnosed as nothing worse than arthralgia.[18] The ALJ also noted that x-rays taken on September 30, 2001 were negative, and that her July 20, 2004 x-rays showed only minimal degenerative joint disease. The ALJ also noted that plaintiff never had surgery, and was never referred for physical therapy or to any pain clinic or pain disorders specialist. While the lack of objective medical evidence is not dispositive to the question of a claimant's credibility, it is an important factor in the ALJ's analysis. <u>Cruse</u>, 867 F.2d at 1186;

---

[18]Arthralgia is defined as "pain in one or more joints." http://www2.merriam-webster.com/cgi-bin/mwmednlm?book=Medical&va=arthralgia

Kisling v. Chater, 105 F.3d 1255, 1257-58 (8th Cir. 1997).

The ALJ also found it significant that no physician who treated or examined plaintiff stated that she was disabled or totally incapacitated, or placed any specific long-term limitations on plaintiff's activities. In fact, the record indicates that, although plaintiff indicated that she had asked Dr. Lieu to provide her with paperwork supporting her contention that she was unable to work due to pain and swelling in her knees (Tr. 189), the record does not reflect that Dr. Lieu ever offered such an opinion. The ALJ also noted that Dr. Cason opined that plaintiff did not need a cane to walk, and that her unassisted gait showed only a slight limp. It can be significant when no examining physician has submitted a medical conclusion that a plaintiff is disabled and unable to perform any type of work. See Brown v. Chater, 87 F.3d 963, 965 (8th Cir. 1996) (finding lack of significant restrictions imposed by treating physicians supported ALJ's determination of no disability); Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995) (the fact that reviewing physicians found no disability can be considered by ALJ so long as ALJ conducts independent analysis of medical evidence in the record).

The ALJ noted that the record reflected several occasions on which plaintiff admitted noncompliance with her medication regimen. One such occasion was during a September 20, 2004 clinic visit, when plaintiff admitted she was not taking her pain medication. (Tr. 15, 189.) The ALJ further noted that the record

contained no evidence that plaintiff had ever been refused medication or services due to an inability to pay, and that she testified during the hearing that she had not even bothered to apply for Medicaid. The ALJ concluded that plaintiff did not seek treatment and/or take her prescribed medications because she did not feel there was a medical need for it. See Riggins v. Apfel, 177 F.3d 689, 693 (8th Cir. 1999) (absent evidence claimant ever sought and was denied low-cost or free medical care, claimant's argument he could not afford medical care was appropriately discounted). Failure to follow a prescribed course of remedial treatment without good reason is inconsistent with complaints of disabling pain. Holley, 253 F.3d at 1092; see also Roth v. Shalala, 45 F.3d 279, 282 (8th Cir. 1995)(citing Johnson v. Bowen, 866 F.2d 274, 275 (8th Cir. 1989)).

The ALJ also noted that, following April 2005, plaintiff did not seek regular, sustained medical treatment for pain or for any other physical or psychological condition. In fact, the record contains no medical evidence at all following a January 2006 emergency room visit, approximately ten months preceding the hearing. The absence of ongoing medical treatment is inconsistent with subjective complaints of pain. See Onstead v. Sullivan, 962 F.2d 803, 805 (8th Cir. 1992); see also Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997) (claimant's failure to seek medical assistance for her alleged physical and mental impairments contradicted her subjective complaints of disabling conditions).

For plaintiff's claim of disabling depression, the ALJ noted that there was no documented evidence of plaintiff "being frequently severely depressed, or of her having an uncontrollable mood disorder." (Tr. 17.) The ALJ noted that the problems necessitating plaintiff's June 2, 2005 hospitalization appeared to be attributed mainly to her concerns involving her children, and perhaps to her admitted recent alcohol and cocaine use. The ALJ noted that, upon discharge, plaintiff's depression had stabilized with medication, and she had a 60 GAF which, according to the Diagnostic and Statistical Manual for Mental Disorders, Fourth Edition, indicated only mild to borderline functional difficulties. Also significant was that, when plaintiff was seen by Dr. Johns for a consultative psychological examination, it was noted that Wellbutrin was managing her depression well. An impairment which can be controlled with medication or treatment is not considered disabling. Brown v. Barnhart, 390 F.3d 535, 540 (8th Cir. 2004). The ALJ noted no documented evidence of any serious deterioration over time of any of plaintiff's functional abilities, and that, during the hearing, plaintiff displayed no obvious signs of depression, anxiety, memory loss, or other mental disturbance. It is further notable that the record contains no evidence that plaintiff ever underwent regular and sustained psychological treatment, or that she received any psychological treatment at all in at least ten months preceding the hearing. A lack of regular and sustained treatment is a basis for discounting complaints and is an indication that the claimant's

impairments are non-severe and not significantly limiting for twelve continuous months. <u>Novotny v. Chater</u>, 72 F.3d 669, 671 (8th Cir. 1995).

Also notable is the fact that, when plaintiff presented to the ConnectCare Urgent Care Center on January 24, 2006, she complained only of pain in her chest which radiated to her back. She did not complain of knee pain, psychological disturbance, or any other condition she alleges disables her. Plaintiff's failure to complain of the impairments she alleges render her totally disabled detract from her credibility. <u>Stephens v. Shalala</u>, 46 F.3d 37, 38 (8th Cir. 1995) (per curiam) (discrediting allegations of back pain when no complaints made about such pain while receiving other treatment.)

A review of the record reveals that the ALJ explicitly discredited plaintiff's subjective allegations of pain and depression for legally sufficient reasons. The undersigned therefore concludes that vocational expert testimony was not required in this case, and the ALJ's reliance upon the Guidelines was proper. <u>See</u> <u>Bolton</u>, 814 F.2d at 538; <u>see</u> <u>also</u> <u>Reynolds</u>, 82 F.3d at 258-59; <u>Carlock</u>, 902 F.2d at 1343; <u>Cruse</u>, 867 F.2d at 1187.

The undersigned further notes that the ALJ properly determined that the plaintiff's other alleged impairments were not of listing-level severity. For plaintiff's claim of disability due to GERD, the ALJ noted that an upper GI series performed on August 9,

2004 was normal, and that her GERD symptoms were well-controlled by medication. Similarly, regarding plaintiff's claim of disability due to hypertension, the ALJ noted that the medical evidence consistently documented that her hypertension was controlled with medication. The ALJ further noted that the record contained no evidence that plaintiff's medication caused any significant side effects. As noted above, conditions that are controllable via medication cannot be considered disabling. <u>Roth</u>, 45 F.3d at 282; <u>Kisling</u>, 105 F.3d at 1257. The ALJ noted that, when plaintiff was evaluated by Dr. Cason on March 7, 2005, her blood pressure was a normal 110/80, and she had no signs of any secondary damage to her eyes, heart, brain or kidneys which may be attributable to chronic hypertension. Of further note are the many instances in the record establishing that plaintiff frequently spent fairly long periods of time off of her blood pressure medication. (Tr. 111, 124, 134, 139.) Unjustified non-compliance with a medication regimen is a good reason to discredit a claimant's allegations of a disabling condition. <u>See</u> <u>Holley</u>, 253 F.3d at 1092.

Therefore, for all of the foregoing reasons, the undersigned concludes that the Commissioner's decision is supported by substantial evidence on the record as a whole. Because there is substantial evidence to support the Commissioner's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a different

outcome, or because another court could have decided the case differently. <u>Gowell v. Apfel</u>, 242 F.3d 793, 796 (8th Cir. 2001; <u>Browning</u>, 958 F.2d at 821. The decision of the Commissioner in denying Plaintiff's claims for benefits is therefore affirmed.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is hereby affirmed, and plaintiff's Complaint is hereby dismissed with prejudice.

Judgment shall be entered accordingly.


_Frederick R. Buckles_
UNITED STATES MAGISTRATE JUDGE


Dated this 24th day of July, 2008.